# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)* )<br>The Cellular Telephone Assigned Call Number 414-629-4401, )<br>whose service provider is T-Mobile, a wireless telephone )<br>service provider headquartered at 4 Sylvan Way, Parsippany, )<br>New Jersey ) | Case No.  22-988M(NJ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____

*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____September 13, 2022_____  *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Honorable Nancy Joseph_____ .

*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☑ until, the facts justifying, the later specific date of _____02/25/2023_____ .

Date and time issued:    08/30/2022 9:48 am

*Judge's signature*

City and state:    Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.:<br>  22-988M(NJ) | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

129.    Records and information associated with the cellular device assigned call number **(414) 629-4401** (referred to herein and in Attachment B as "**Target Cell Phone #1**"), with listed subscriber of Geno Nottolinis Pizza, LLC, 1101 S. 26th Street, Milwaukee, Wisconsin, that is in the custody or control of T-Mobile, (referred to herein and in Attachment B as the "Provider"), a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey  07054.

1.    **Target Cell Phone #1.**

# ATTACHMENT B

## Particular Things to be Seized

## I.    Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.    The following subscriber and historical information about the customers or subscribers associated with **Target Cell Phone #1** for the time period January 1, to the present:

  i.    Names (including subscriber names, user names, and screen names);

  ii.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

  iii.    Local and long-distance telephone connection records;

  iv.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v. Length of service (including start date) and types of service utilized;

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by **Target Cell Phone #1** for the time period January 1, 2020, to the present including:

 a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone

3

numbers (call detail records), email addresses, and IP addresses); and

b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as per-call measurement data (also known as "real-time tool" or "RTT").

b. Information associated with each communication to and from **Target Cell Phone #1** for a period of **30** days from the date of this warrant, including:

   i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

   ii. Source and destination telephone numbers;

   iii. Date, time, and duration of communication; and

   iv. All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e., faces of the towers) to which **Target Cell Phone #1** will connect at the beginning and end of each communication, as well as per-call measurement data (also known as "real-time tool" or "RTT").

c. Information about the location of **Target Cell Phone #1** for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II

4

data, RTT data, GPS data, latitude-longitude data, and other precise location information.

    i.    To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of Target Cell Phone #1 on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

    ii.    This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.    Information to be Seized by the Government

5

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846; and Title 18, United States Code, Sections 1956 and 1957, involving Francisco HERNANDEZ BACA.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The Cellular Telephone Assigned Call Number 414-629-4401,<br>whose service provider is T-Mobile, a wireless telephone service<br>provider headquartered at 4 Sylvan Way, Parsippany, New Jersey | )<br>)<br>)<br>)<br>)<br>)    Case No.<br>)    22-988M(NJ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Sections 841(a)(1) | Distribution and possession with the intent to distribute controlled substances |

The application is based on these facts:
See attached affidavit.

- ☐ Continued on the attached sheet.
- ☑ Delayed notice of _180_ days *(give exact ending date if more than 30 days:* _02-25-2023_ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Jeffrey Hale, DCI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_telephone_____ *(specify reliable electronic means)*.

Date: 8/30/2022

_____
*Judge's signature*

City and state: Milwaukee, WI

Hon. Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF A
# SEARCH WARRANT

## I. INTRODUCTION

I, Jeffrey Hale, being duly sworn, do depose and state as follows:

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for the continued information about the location of the cellular telephone assigned call number **(414) 629-4401** ("**Target Cell Phone #1**"), whose service provider is T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey. **Target Cell Phone #1** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3. I am a state certified law enforcement officer employed as a Special Agent with the Wisconsin Department of Justice, Division of Criminal Investigation (DCI) and have been a sworn officer in the State of Wisconsin for approximately 27 years. I am currently assigned to the North Central High Intensity Drug Trafficking

1

Area (HIDTA) Opioid Task Force. I am also a federally deputized Task Force Officer with the United States Department of Justice, Drug Enforcement Administration (DEA). As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

4.    In connection with my official DCI and DEA duties, I investigate criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 924(c), 1956 and 1957, Title 21, United States Code, Sections 841, 843, 846, 848, 952, and 963. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances. I have participated in the execution of multiple federal search warrants.

5.    I have received training in the area of controlled substances investigations, money laundering, financial investigations, and various methods that drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of state and federal controlled substances laws. I have participated or assisted in numerous federal and state search warrants for narcotic related offenses that have resulted in the seizure of United States currency, vehicles, real estate, and jewelry from individuals involved in narcotics trafficking.

2

6.      Based on my training, experience and participation in drug trafficking investigations and associated financial investigation involving controlled substances, I know and have observed the following:

    a.      I am familiar with the methods used by drug traffickers and drug organizations to manufacture, smuggle, safeguard, and distribute controlled substances, and to collect and launder trafficking-derived proceeds;

    b.      I am familiar with the methods employed by drug traffickers to thwart any investigation of their illegal activities;

    c.      I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency to maintain and finance their ongoing drug business and that electronic telecommunications are used to conduct drug trafficking;

    d.      I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, passbooks, letters of credit, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within residences, businesses or other locations, including storage locations, over which they maintain dominion and control;

    e.      I know it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of

3

financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledger, etc., are maintained where the traffickers have ready access to them;

f.      It is common practice for individuals who are involved in business activities of any nature to maintain books and records of such business activities for lengthy periods of time. It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible such as in their businesses, offices, storage facilities, or personal residence;

g.      I am familiar with computers, cellular telephones, pagers and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers and by those engaged in money laundering activities to communicate with their associates and financial institutions; That drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the form of voicemail, email, text messages, video and audio clips, floppy disks, hard disk drives, flash drives, CD's, DVD's, optical disks, Zip disks, flash memory cards, Smart media and any data contained within such computers or cellular telephones, electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices;

4

7.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8.     Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

9.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) (distribution and possession with the intent to distribute controlled substances) and 846 (conspiracy to distribute and possess with the intent to distribute controlled substances); and Title 18, United States Code, Sections 1956 and 1957 (laundering of monetary instruments), have been committed, are being committed, and/or will be committed by Francisco HERNANDEZ BACA (DOB: XX/XX/1982). There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

10.     The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court

5

is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

11.     This investigation was initiated in September of 2018. To date, case agents have determined that a group of individuals, including, but not limited to Francisco HERNANDEZ BACA, both known and unknown, are involved in a drug trafficking organization (DTO) that distributes cocaine in the Eastern District of Wisconsin.

## II.     PROBABLE CAUSE

### A.  Background and Summary of Investigation

12.     In September 2018, members of North Central High Intensity Drug Trafficking Area (HIDTA) and the Drug Enforcement Administration (DEA) initiated an investigation into individuals distributing large quantities of cocaine and marijuana throughout Milwaukee, Wisconsin, and elsewhere. Law enforcement authorities identified the individual spearheading the DTO in Milwaukee, Wisconsin, as Louis R. PEREZ III (PEREZ III) (a/k/a "Ocho," and a/k/a "Eight Ball"). This DTO obtained marijuana and marijuana related products from Julian SANCHEZ and Miguel SARABIA, who operated in the Central and Northern Districts of California. The investigation has further revealed that, upon the sale of controlled substances in the Milwaukee, Wisconsin, area, DTO members mail drug proceeds using the United States Postal Service (USPS) to the California-based suppliers.

13.     The investigation into the PEREZ III DTO evolved into several court authorized interceptions of four DTO members telephones, as well as a court

6

authorized interception of PEREZ III's Snapchat account throughout the spring, summer and fall of 2020.

14.     On September 22, 2020, case agents executed multiple search and arrest warrants in the Eastern District of Wisconsin, as well as the Central District of California related to the PEREZ III DTO. Case agents arrested 25 DTO members, 24 of which have subsequently pled guilty to various charges in the Eastern District of Wisconsin. The one remaining DTO member has entered into a plea agreement with the government, with one defendant remaining a fugitive.

15.     The investigation has continued, and The Federal Bureau of Investigation (FBI) and North Central High Intensity Drug Trafficking Area (HIDTA) are investigating Francisco HERNANDEZ BACA (DOB: XX/XX/1982), aka "Gallo," and other unidentified persons involved in a drug trafficking organization (DTO). The investigation to date has included traditional law enforcement methods, including, but not limited to: interviews with confidential sources and sources of information; information gathered from other law enforcement officers; documentary evidence; pen register, trap and trace, and telephone toll data; controlled meetings with targets, recorded telephone calls with targets, and physical surveillance.

16.     Through the investigation, case agents have identified a cellular telephone number used by HERNANDEZ BACA as cellular telephone (414) 629-4401 **(Target Cell Phone #1)**. Case agents subpoenaed **Target Cell Phone #1** for subscriber information. Your affiant's review of the subpoenaed results reveal that **Target Cell Phone #1** is subscribed to by Geno Nottolinis Pizza, LLC, 1101 S. 26th

7

Street, Milwaukee, Wisconsin. Case agents are aware that 1101 S. 26th Street, Milwaukee, Wisconsin was, and may still be, the personal residence of HERNANDEZ BACA. As of June 2022, case agents observed a food truck displaying signage, "Taqueria Los Gallos," a restaurant owned and operated by HERNANDEZ BACA, parked in the back of 1101 S. 26th Street. Additionally, according to the Wisconsin Department of Financial Institutions, the registered agent for Geno Nottolini's Pizza Milwaukee LLC is Francisco HERNANDEZ BACA, listing an address of 1800 S. 13th Street, Milwaukee, Wisconsin. Case agents are aware that HERNANDEZ BACA owns and operates "Taqueria Los Gallos," and that it is located at 1800 S. 13th Street, Milwaukee, Wisconsin.

17.     On July 28, 2022, United States Magistrate Judge Stephen Dries authorized a pen register on **Target Cell Phone #1**. This pen register is set to expire on September 25, 2022.

18.     Case agents have analyzed pen register data for **Target Cell Phone #1** from January 1, 2022, to August 18, 2022, and the analysis showed that **Target Cell Phone #1** is in contact with several known and suspected high-level narcotics traffickers.

## CARNITAS LOS GALLOS, LLC

19.     On September 17, 2020, United States Magistrate Stephen Dries, Eastern District of Wisconsin signed a federal arrest warrant for Louis R. PEREZ III as well as a search warrant for PEREZ III's residence, 1653 S. 57th Street, West Allis, Wisconsin.

8

20.     On September 22, 2020, case agents executed the search warrant at 1653 S. 57th Street, West Allis, Wisconsin.  During the execution of the search warrant PEREZ III was located at the residence and taken into custody and later turned over to the United States Marshal Service.

21.     During a search of the residence case agents recovered approximately $135,453 in U.S. Currency, located inside of a lunchbox sized cooler hidden behind the headboard in the master bedroom. Case agents also located an AR rifle beneath the bed in the master bedroom. In total case agents recovered four firearms from the master bedroom of the residence as well as three other firearms elsewhere in the residence.

22.     Case agents also located multiple documents which reflected a recent (September 2020) real estate transaction involving the purchase of a property located at 2531-2533 W. National Avenue, Milwaukee, Wisconsin.  In particular, case agents reviewed documents from Capital Title & Closing Services regarding title # 2020083258.  A review of these documents revealed that on September 1, 2020, Juan Melendez of Lago Azul Properties, LLC sold 2531-2533 W. National Avenue, Milwaukee, Wisconsin, to Louis PEREZ III and Francisco HERNANDEZ     BACA (a/k/a "Gallo") of Midwest Gallos, LLC.  Melendez signed the closing documents as the seller and PEREZ III and HERNANDEZ BACA signed as the buyers.

23.     Other documents seized from the residence included a Chase Bank credit card issued for Ling Ling Nails LLC. 2100 W. Pierce St., Apt. 201, one of the known stash locations of the PEREZ III DTO and a Chase Bank Business Depository

9

Certificate (Limited Liability Company) for a checking account under the business name Ling Ling Nails LLC with the deposit and withdrawal authorization listing Louis Rey PEREZ III and Xina Yang.

24.    Other documents seized from the residence related to HERNANDEZ BACA included:

a.  A document from JPMorgan Chase Bank dated August 19, 2020, through August 31, 2020, for Primary Account 638333275, Chase Total Business Checking account and Account 3837639609 for Chase Business Total Savings. The name on the account was listed as "Carnitas Los Gallos LLC, 1653 S. 57th Street, Milwaukee, WI 53214-5106."

b.  A document from the State of Wisconsin Department of Workforce Development dated August 24, 2020, for "Carnitas Los Gallos LLC, 1653 S. 57th Street, West Allis, WI 53214-5106."

c.  Two documents from the Wisconsin Department of Revenue addressed to "Louis R. Perez III, Carnitas Los Gallos LLC, 1653 S. 57th Steet, West Allis, WI 53214."

d.  A document from the United States Department of Treasury, dated August 20, 2020, addressed to "Carnitas Los Gallos LLC, % Louis R. Perez III Mbr, 1653 S. 57th Street, Milwaukee, WI 53214-5106."

10

e. Documents establishing a trust account under the name "13 Investing Trust." Case agents review of the document revealed that the trust was established on June 6, 2020, with the trustee listed as "Luis Perez."

25. A query with the Wisconsin Department of Financial Institutions website on September 22, 2020, revealed the registered agent of Lago Azul Properties, LLC was Juan Melendez, the previous owner of 2531-2533 W. National Avenue, Milwaukee, Wisconsin. A query of the same website revealed the registered agent of Midwest Gallos LLC was Louis R. PEREZ at 1653 S. 57th Street, West Allis, Wisconsin.

26. After Louis PEREZ III was apprehended, he was advised of his Constitutional Rights which PEREZ III stated he understand and wished to waive. During In PEREZ III's *Mirandized* statement, PEREZ III acknowledged involvement in the distribution of controlled substances with his family members. When case agents stated that case agents were aware that PEREZ III owned and / or had access to numerous properties, PEREZ III stated the case agents already knew about his properties.

27. During interceptions over PEREZ III's Snapchat account Midwest Connect, on or about August 19, 2020, case agents intercepted a Snapchat story sent by PEREZ III. The Snapchat story depicted a Chase bank folder with a business account check for $10,000 payable to Carnitas Los Gallos LLC dated August 18, 2020. The Snapchat also depicted a large bundle of U.S. currency as well as a money order from Pick 'n Save in the amount of $1,000 payable to Carnitas Los Gallos.

11

28.     A check for the utility subscriber of 2531 W. National Avenue on September 22, 2020, revealed the current subscriber since 2014 as of September 22, 2020, was Lago Azul Properties LLC, with a listed telephone number of 262-716-1486. This property was subsequently seized and forfeited in *United States v. Louis Perez III, et al*, Case No. 20-CR-185.

29.     On September 3, 2020, Milwaukee Police Department officers arrested HERNANDEZ BACA in the 2600 block of West National Avenue after receiving a man with a gun complaint. HERNANDEZ BACA was observed by officers pointing a firearm at a moving vehicle which continued driving from the area. HERNANDEZ BACA was arrested as a felon in possession of a firearm. During a conversation with a Milwaukee Police Department Sergeant who was familiar with HERNANDEZ BACA, HERNANDEZ BACA stated that he was in that area because he had recently purchased the property at 2531 W. National Avenue.  HERNANDEZ BACA further stated that he had purchased half of the business with another individual named "LOUIS." HERNANDEZ BACA stated "LOUIS" also owned hair salons named "Ling," and that they intended to name the new business at 2531 W. National Avenue "Gallos Carnitas."

30.     On September 22, 2020, case agents contacted Juan Melendez, the registered agent for Lago Azul Properties.  Melendez stated that he had sold the property to Francisco HERNANDEZ BACA and another male individual in late August 2020 for $125,000. Case agents asked whether the other male subject who purchased the property with HERNANDEZ BACA was named Louis PEREZ.

Melendez stated he believed so and indicated that the other male subject's name was on the closing documents as the co-purchaser with HERNANDEZ BACA. Case agents displayed a photo of PEREZ III to Melendez and Melendez positively PEREZ III as the co-purchaser of the property with HERNANDEZ BACA.

31.    Later in the evening on September 22, 2020, United States Magistrate Judge Stephen Dries, Eastern District of Wisconsin, issued a search warrant for 2531 W. National Avenue, Milwaukee, Wisconsin.

32.    Case agents executed the search warrant at 2531 W. National Avenue, Milwaukee, Wisconsin the same evening it was authorized. A subsequent search of the property revealed the property appeared to be a restaurant that was in the final stages of opening. The kitchen area contained restaurant equipment used for cooking, and the basement area contained bulk food items with shelving for storage.

33.    On September 25, 2020, case agents executed an additional search warrant at 1653 S. 57th Street, West Allis, Wisconsin related to this investigation. During the course of this search warrant, agents recovered $7,500 in U.S. currency. During this search, agents also located a letter from Ahmad and Associates law firm dated September 25, 2020, which stated that "Mr. Luis Perez" had paid $8,500 in cash for legal representation fees for "Mr. Francisco." The letter further stated that because of a conflict of interest, the law firm would be unable to represent "Mr. Francisco," and as a result, the law firm was refunding the remaining $7,500 of the retainer fee to Mrs. Violeta Gonzalez (the mother of Louis PEREZ III) at the request

13

of Luis Perez. Case agents seized this $7,500, and it was subsequently forfeited under the above-referenced case number.

34. During the execution of the search warrant on September 25, 2020, and shortly after the agents had made entry into the residence, PEREZ III's sister, Lissette Perez Mejia arrived at the residence along with other family members. Case agents spoke with Perez Mejia and explained to her that agents were at the residence searching for additional evidence, including a gold necklace and "rooster" pendant that belonged to PEREZ III that had not been located during the search warrant execution at the residence on September 22, 2020. Perez Mejia initially denied knowing the location of the necklace and "rooster" pendant; however, after further discusstion with case agents, Perez Mejia stated that an individual named "Gallo" came to the residence the night before (September 24, 2020) and picked up the necklace and "rooster" pendant.[1] Case agents informed Perez Mejia that case agents were there to seize the necklace and "rooster" pendant. Perez Mejia then stated that she would call "Gallo" in an efffort to retrieve the necklace and "rooster" pendant. At this time, Perez Mejia called an individual on her cellphone and spoke in Spanish to a female she subsequently identified as "Gloria," the girlfriend or wife of "Gallo." After the call, Perez Mejia stated Gloria had the necklace at their restaurant and law enforcement could pick it up there. Case agents asked Perez Mejia for the telephone number she called, but she refused to provide it to case agents.

---

[1] As discussed *infra,* case agents are aware that HERNANDEZ BACA is also known as "Gallo."

35.     Case agents proceeded to the restaurant Taqueria Los Gallos, located at 1800 S. 13th Street, Milwaukee, Wisconsin. Case agents know that this restaurant is owned and operated by HERNANDEZ BACA. HERNANDEZ BACA was not present at the restaurant, but case agents met with HERNANDEZ BACA's wife, identified as Gloria Hernandez. Gloria Hernandez turned over the necklace and "rooster" pendant to case agents. The necklace and "rooster" pendant were subsequently forfeited by PEREZ III to the U.S. government under the above-referenced case number.

36.     As a result of the numerous search warrants executed on September 22 and 25, 2020, case agents seized in excess of 100 cellular telephones from various defendants, residences, and vehicles associated with the PEREZ III DTO.

37.     One of these cellular telephones, identified as (213) 259-9593, was seized from PEREZ III at 1653 S. 57th Street, West Allis, Wisconsin. A forensic analysis of this telephone by case agents revealed the following information related to HERNANDEZ BACA:

    a.     Contained in the photos section of the phone was a screen shot from "inmateseach.mkesheriff.org" depicting a booking photograph and physical descriptors for Francisco HERNANDEZ BACA, showing a custody date of "09/04/2020." The screen shot further stated "Charges pending."

    b.     Contained in the contacts section of the phone was an entry titled "Gallo Wife" for both a WhatsApp number and phone number of 414-629-4544. Case agents subpoenaed information related to this telephone number.  Case agents' review of information provided as a result of this subpoena revealed that the

15

subscriber for this telephone number is listed as Geno Nottolinis Pizza, LLC, 1101 S. 26th Street, Milwaukee, Wisconsin.

      c.     Contained in the "Notes" section of the phone was a note created on September 4, 2020, that stated "Francisco Hernandez Vaca 02/26/1982." Based upon their training, experience and familiarity with the investigation, case agents believe that this note is in reference to the arrest of HERNANDEZ BACA on September 3, 2020, and that the name "Vaca" was a typographical error for "Baca" as the date of birth matches that of HERNANDEZ BACA.

      d.     Contained in the "Notes" section of the phone was a note created on September 2, 2020, that stated "Owe paint 2k for carnitas shop." Case agents believe that this note refers to a PEREZ III $2,000 debt for paint at the 2531 W. National Avenue, Milwaukee, Wisconsin, restaurant.

      e.     Also contained in the "Notes" section of the phone was a note created on August 21, 2020, that stated "Los Gallos Extras. 19,4 extras. Just gotta give gallo 4gs 08/21/20. $25,600 left to buy the house. Total price: 45k." Case agents believe that this note refers to an additional $19,400 spent by PEREZ III and HERNANDEZ BACA related to the opening of the restaurant at 2531 W. National Avenue.  The note additionally refers to a debt of $4,000 that remained outstanding from PEREZ III to HERNANDEZ BACA $4,000 as of August 21, 2020.

38.     An additional cellular telephone, identified as (213) 605-4333, was also seized from PEREZ III at 1653 S. 57th Street, West Allis, Wisconsin. A forensic

analysis of this telephone by case agents revealed the following information related to HERNANDEZ BACA:

 a. Contained in the contacts section of the phone was the name "Gallo" with a corresponding telephone number of (414) 629-4401 **(Target Cell Phone #1).** Also contained in the contacts section of the phone was the name "Gallo Wife" with a corresponding telephone number of (414) 629-4544.

 b. Contained in the photos section of the phone was a photograph of PEREZ III and HERNANDEZ BACA. HERNANDEZ BACA is wearing a baseball cap with the word "GALLO" depicted on it. Both PEREZ III and HERNANDEZ BACA are both wearing gold pendants. Based upon a comparison with the seized and forfeited rooster pendant, the pendant worn by PEREZ III in the photograph appears to be the same "rooster" pendant that was seized on September 25, 2020, from HERNANDEZ BACA's wife.

 c. Contained in the photos section of the phone was a photograph of PEREZ III and Xina YANG wearing gold pendants and holding what appear to be bingo style balls depicting numbers. Again, case agents believe PEREZ III was wearing what appears to be the same "rooster" pendant that was seized on September 25, 2020, from HERNANDEZ BACA's wife.

 d. Contained in the photos section of the phone is a picture of a blank check from JPMorgan Chase Bank, N.A., depicting the account number and name of "Carnitas Los Gallos LLC."

17

e.      Contained in the photos section of the phone are two photographs of what appear to be five rectangular shaped bricks of suspected cocaine stamped with the notation "C19." Based upon the investigation to date, case agents believe that each brick is a half-kilogram quantity of cocaine. Addditonally, on September 20, 2020, at 4:20 p.m., PEREZ III, using the WhatsApp account tied to telephone number (213) 605-4333, sent a Whatsapp message to an unknown male named "Austin." The message consisted of a picture displaying five rectangular shaped bricks of suspected cocaine, with "C19" stamped on each one. PEREZ III immediately followed the picture message with an additional message stating, "half each." Based upon the investigation to date, including information from Sources of Information ## 3, 17 and 18, case agents believe that this cocaine was part of the kilogram quantities of cocaine supplied to PEREZ III by HERNANDEZ BACA in  September 2020, and that the cocaine was packaged in half kilogram quantities.

f.      Also, contained in the "Notes" section of the phone was a note that was created on August 19, 2020, titled "Gallo INVESTMENT." The note stated, "Gallo INVESTMENT PAID 19k+9500+9500+19k+10k+10k+9600+10k+20k+8400      Owe-75k    Total -200k for Carnita Business     45k for House "Paid" 26th street    1k for closing on 26th street house 08/25/20 3k for cost/closing fees for business 08/25/20." Based upon their training, experience and familiarity with the investigation, case agents believe that PEREZ III created this note to track the cash PEREZ III had invested in the restaurant "Carnitas Los Gallos," 2531 W. National Avenue. The above listed sums paid by PEREZ III add up to $125,000, with a total amount owed

of $200,000. PEREZ III thus continued to owe $75,000 to HERNANDEZ BACA. Case agents further believe that the note, "45k for House "Paid" 26th street," refers to the residence located at 1107 S. 26th Street, Milwaukee, Wisconsin; one of the residences that PEREZ III had purchased shortly before PEREZ III was arrested. Case agents are aware that the PEREZ III DTO utilized this location as a "stash house." Case agents further believe that PEREZ III's note referencing, "3k for cost/closing fees for business 08/25/20" memorializes an additional $3,000 that PEREZ III paid for the closing fees to purchase the property located at 2531 W. National Avenue.

39. The Internal Revenue Service conducted a financial analysis of the bank accounts associated with HERNANDEZ BACA and PEREZ III's JPMorgan Chase accounts. This analysis revealed that account number 638333275 was opened on August 19, 2020, under the name "Carnitas Los Gallos LLC," and listed the account signatories as Francisco HERNANDEZ BACA and Louis Rey PEREZ III. The analysis is summarized below.

40. On August 19, 2020, the day HERNANDEZ BACA and PEREZ III opened the account, $29,000 was deposited into the account which consisted of the following: (a) one $9,500 cash deposit; (b) nine (9) $1,000 money orders from Pick 'n Save #407; (c) one (1) $500.00 Money Order from Pick 'n Save #407; and (d) one (1) $10,000 check from La Carreta LLC.

41. On August 20, 2020, the account received an additional $20,000 cash deposit. On August 21, 2020, the account received a $38,900 deposit consisting of the following four cashier's checks: (a) $9,500 from 13 Investing Trust with the

memo "Capital Investment;" (b) $9,900 from Victor R Avila; (c) $9,900 from Israel Relingh Aguirre; and (d) $9,600.00 from Daniel Perez.

42.     The sum of these three deposits from August 19, 20, and 21, 2020, totaled $87,900.[2]

43.     On August 25, 2020, a transfer in the amount of $85,372.00 was made to account number 638951829. HERNANDEZ BACA and PEREZ III  are also signatories for this account. On August 21, 2020, HERNANDEZ BACA and PEREZ III opened this account under the name Midwest Gallos, LLC.

44.     The analysis conducted by the IRS also revealed another notable transaction under account 638333275.  On September 22, 2020, the day of PEREZ III's arrest related to this investigation and the execution of multiple search warrants, an $8,000 withdrawal occurred. The bank records did not detail the withdrawal, so it is unknown if the withdrawal was in cash or a check.  On January 29, 2021, account 638333275 was closed.

45.     On August 21, 2020, account number 638951829 was opened at JPMorgan Chase Bank under the name "Midwest Gallos LLC," with account signatories listed as Francisco HERNANDEZ BACA and Louis Rey PEREZ III. The analysis is summarized below.

46.     On August 21, 2020, the day the account was opened, a $39,000 deposit was made consisting of the following five cashier's checks: (a) $5,820.00 from Francisco HERNANDEZ BACA; (b) $5,780.00 from Geno Nottolini's Pizza

---

[2]  Through the investigation, case agents are aware that many of the names associated with the deposited cashier's checks are friends and associates of PEREZ III and HERNANDEZ BACA.

Milwaukee LLC; (c) $9,500.00 from Geno Nottoliini's Pizza Milwaukee LLC; (d) $9,500.00 from Francisco HERNANDEZ BACA; and (e) $8,400.00 from Gloria Cruz-Gomez.

47.    On August 25, 2020, $85,372.00 was transferred from account number 638333275. The sum of deposits from August 21 and 25, 2020, amounted to $124,372.00.

48.    On September 1, 2020, a cashier's check was issued to Capital Title for $123,063.47. Based upon the investigation to date, case agents believe that this cashier's check was used to purchase the property located at 2531 W. National Avenue.

49.    On September 23, 2020, and September 24, 2020, respectively, two $50.00 debits occurred. According to the bank records, these debits were for "inmate phone service." Because these debits were within forty-eight hours PEREZ III'S arrest and the arrest of multiple DTO members, agents believe that HERNANDEZ BACA utilized this account to purchase phone service for PEREZ III and/or others who were arrested on September 22, 2020, as part of the PEREZ III DTO investigation.  On January 29, 2021, account number 638951829 was closed.

B.    **Confidential Source Information**

1.    **Information Obtained from Cooperating Source One (SOI #1)[3]**

---

[3]  Beginning in late October of 2019, a source of information (SOI #1) made statements against SOI #1's penal interest.  According to law enforcement databases, SOI #1 has entered guilty pleas to a felony drug trafficking conspiracy and a money laundering offense.  SOI #1 is cooperating in exchange for consideration in the two previously mentioned offenses.  Thus far, the information provided by SOI #1

50.     On October 24, 2019, a federal search warrant was executed at 3733 S. 13th Street, Milwaukee, Wisconsin, the residence of SOI #1. During the course of the search, agents located the following: $12,000 in U.S. currency, a rifle with an extended magazine, a pistol, thirteen cellular telephones, a money counter, packaging materials including bags, scales, rubber gloves, and a vacuum sealer, and approximately 500 grams of cocaine.[4]

51.     Also on October 24, 2019, SOI #1 was arrested in Milwaukee, Wisconsin, on a federal arrest warrant issued in the Southern District of Ohio, charging SOI #1 with Conspiracy to Possess with Intent to Distribute and to Distribute a Controlled Substance. Upon arrest, SOI #1 provided information regarding PEREZ III.

52.     SOI #1 identified a photograph of PEREZ III and stated that SOI #1 knows PEREZ III by face, but doesn't know his real name. SOI #1 stated that SOI #1 only knows PEREZ III by the nickname of "Grenas." SOI #1 met PEREZ III approximately 1 ½ to two years before SOI #1's arrest. SOI #1 began supplying kilogram quantities of cocaine to PEREZ III shortly after meeting PEREZ III.

53.     SOI #1 stated that PEREZ III split his time between Milwaukee and California, and SOI #1 did not supply drugs to PEREZ III on a regular basis. According to SOI #1, SOI #1 saw PEREZ III infrequently, and their encounters were for the sole purpose of conducting drug transactions. SOI #1 stated that PEREZ III

---

has been corroborated by information known to case agents gathered during the course of this investigation. According to law enforcement databases, SOI #1 has no criminal record. Within the context of the information detailed and relied upon for purposes of this affidavit, law enforcement believes SOI#1 is credible and SOI#1's information reliable.

[4] At the time of the search, this substance field tested positive for fentanyl; however, laboratory testing revealed that the substance is cocaine.

was very close with PEREZ III's family members and did not trust very many people. SOI #1 stated that SOI #1's dealings were with only PEREZ III, and PEREZ III never brought anyone with him when obtaining cocaine from SOI #1. PEREZ III told SOI #1 that he preferred to conduct drug transactions himself so that PEREZ III could better control the transaction. SOI #1 did not know any of PEREZ III's customers.

54.     SOI #1 stated that PEREZ III brought approximately 800-1,000 pounds of high-grade marijuana to Milwaukee from California each month for distribution in the Milwaukee area.  PEREZ III also sold "vape pens" containing THC in the Milwaukee, area.  PEREZ III told SOI #1 that PEREZ III made more money selling marijuana than cocaine or heroin.

55.     SOI #1 identified a photograph of PEREZ JR., PEREZ III's father, and stated that PEREZ JR. transported marijuana and cocaine from California to Milwaukee for PEREZ III.  SOI #1 further stated that PEREZ III told SOI #1 that PEREZ JR. was involved in a traffic stop and arrested by the police. PEREZ III was upset and told SOI #1 that PEREZ III believed that someone "snitched" on PEREZ III, resulting in PEREZ JR. being stopped by the police. SOI #1 did not know what PEREZ JR. had in the vehicle, but knew that PEREZ JR. had a pending case as a result of the traffic stop.

56.     SOI #1 stated SOI #1 supplied PEREZ III with approximately 10 kilograms of cocaine per week over the last 1 ½ to two years when PEREZ III was in Milwaukee, and one kilogram of heroin around February or March of 2019. According to SOI #1, PEREZ III mainly sold kilogram quantities of cocaine and large amounts

23

of marijuana. SOI #1 stated that PEREZ III paid approximately $30,000 for a kilogram of cocaine and approximately $46,000 for a kilogram of heroin. PEREZ III always paid SOI #1 in cash. PEREZ III told SOI #1 about obtaining kilograms of methamphetamine, but SOI #1 had no direct knowledge of PEREZ III selling methamphetamine.

57. SOI #1 stated that PEREZ III maintained an additional kilogram level cocaine source of supply in California and Milwaukee. PEREZ III told SOI #1 that even though the kilograms of cocaine cost a little more in Milwaukee than California, it was sometimes easier and less risky for PEREZ III to obtain the cocaine in Milwaukee. SOI #1 did not know how PEREZ III transported the cocaine to Milwaukee from California since PEREZ JR. was arrested.

58. According to SOI #1, a few days before SOI #1 was arrested, PEREZ III contacted SOI #1 and requested seven kilograms of cocaine, but SOI #1 did not have any. SOI #1 stated PEREZ III said that he would go to his "other guy," even though PEREZ III liked the quality of SOI #1's cocaine better. SOI #1 described himself/herself as the "back up supplier."

59. According to SOI #1, PEREZ III told SOI #1 that PEREZ III had two "stash houses" in Milwaukee, but SOI #1 did not know where those houses were located.

60. SOI #1 further indicated that PEREZ III stated that PEREZ III had a customer who purchased kilogram quantities of heroin from PEREZ III, but that PEREZ III didn't like selling heroin. PEREZ III said that selling heroin was

24

"dangerous." PEREZ III told SOI #1 that PEREZ III's heroin supplier was in Milwaukee.

61.     SOI #1 stated that SOI #1 had a telephone number for PEREZ III in one or more of SOI #1's cellular telephones, and that the number would be stored under the name "Grenas." SOI #1 frequently changed telephone numbers so SOI #1 could not say which one of SOI #1's phones contained the "Grenas'" phone number. SOI #1 recalled mainly texting and calling with PEREZ III and stated that PEREZ III also frequently changed his telephone numbers.

## 2.     Information Obtained from Cooperating Source Seventeen (SOI #17)[5]

62.     In May of 2022, case agents met with SOI #17. SOI #17 provided the following information related to HERNANDEZ BACA.

63.     SOI #17 identified a photograph of Francisco HERNANDEZ BACA and stated that HERNANDEZ BACA used the street name of "Gallo." SOI #17 stated that SOI #17 only contacted HERNANDEZ BACA at one telephone number and identified that number as cellular telephone number (414) 629-4401 (**Target Cell Phone #1**).

---

[5]  Beginning in May of 2022, SOI #17 made statements against SOI #17's penal interest. According to law enforcement databases, SOI #17 has prior felony convictions for a drug trafficking conspiracy and the use of firearms in furtherance of drug trafficking, and a conviction for possessing a dangerous weapon under age 18. SOI #17 is cooperating in exchange for consideration in the two previously mentioned felony convictions. Thus far, the information provided by SOI #17 has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the investigation. More specifically, SOI #17's information has been corroborated by seizures of physical evidence, documentary evidence, and lawfully obtained device extractions, physical surveillance, and examination of other police reports. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe SOI #17 is credible and SOI #17's information reliable.

SOI #17 stated that HERNANDEZ BACA did not discuss criminal activity on the telephone and would only discuss criminal activity in person.

64.     SOI #17 stated that HERNANDEZ BACA owned a restaurant named Taqueria Los Gallos on S. 13th Street in Milwaukee. Case agents are aware from this investigation that the restaurant Taqueria Los Gallos is located at 1800 S. 13th Street, Milwaukee, Wisconsin, and is owned by HERNANDEZ BACA.

65.     Towards the end of 2019, HERNANDEZ BACA conducted a raffle at the restaurant for a gold necklace and "rooster" pendant at HERNANDEZ BACA's restaurant. HERNANDEZ BACA was selling "bingo balls" for a certain amount of money and for each bingo ball purchased, the purchaser would be entered in the raffle for the necklace and "rooster" pendant. HERNANDEZ BACA had previously observed SOI #17 with other drug traffickers and SOI #17 and HERNANDEZ BACA exchanged telephone numbers and began talking regularly.

66.     Around the beginning of 2020, SOI #17 approached HERNANDEZ BACA about purchasing a kilogram quantity of cocaine from HERNANDEZ BACA. SOI #17 told HERNANDEZ BACA that SOI #17 could sell multiple kilograms of cocaine quickly. HERNANDEZ BACA listened to SOI #17; however, HERNANDEZ BACA didn't either quote any prices for kilograms of cocaine or say that HERNANDEZ BACA could obtain the cocaine for SOI #17. HERNANDEZ BACA told SOI #17 that HERNANDEZ BACA would contact "his cousin" from Chicago for SOI #17.

67.     Until towards the end of the summer of 2020, SOI #17 didn't hear anything more from HERNANDEZ BACA regarding HERNANDEZ BACA supplying cocaine to SOI #17. At this time, HERNANDEZ BACA contacted SOI #17 and told SOI #17 that HERNANDEZ BACA's "cousin" was ready to sell two or three kilograms of cocaine to SOI #17 for approximately $45,000 per kilogram.

68.     Subsequently, SOI #17 went with HERNANDEZ BACA to Chicago, Illinois, and SOI #17 and HERNANDEZ BACA met with HERNANDEZ BACA's "cousin." HERNANDEZ BACA's "cousin" told SOI #17 that he could obtain ten to fifteen kilograms of cocaine for SOI #17 at the price point of $44,000 per kilogram. SOI #17 told the cousin that SOI #17 only had money to purchase two or three kilograms at that time.[6]

69.     SOI #17 provided cash for the two or three kilograms of cocaine to HERNANDEZ BACA's "cousin." SOI #17 and HERNANDEZ BACA drove to a restaurant in Chicago to wait for the cocaine. A short time later, a driver arrived at the restaurant with the two or three kilograms of cocaine. The driver drove the kilograms of cocaine to Milwaukee followed by SOI #17 and HERNANDEZ BACA, who were in another vehicle.

70.     Approximately three to seven days later, SOI #17 arranged another cocaine transaction with HERNANDEZ BACA. SOI #17 stated that this transaction had been arranged for five kilograms of cocaine at a price point of $39,000 to $40,000 per kilogram. SOI #17 stated that it was not planned for HERNANDEZ BACA to be

---

[6] SOI #17 was unable to recall whether SOI #17 purchased two or three kilograms of cocaine from HERNANDEZ BACA's "cousin" during this transaction.

present for this transaction; however, HERNANDEZ BACA told SOI #17 to drive to Chicago in HERNANDEZ BACA's van. SOI #17 and one of SOI #17 associates drove HERNANDEZ BACA's van. An additional associate of SOI #17's drove a different vehicle in order to transport the cocaine back to Milwaukee for SOI #17. SOI #17 brought approximately $200,000 in U.S. currency with SOI #17 to conduct the transaction.

71.    While en route to Chicago, HERNANDEZ BACA contacted SOI #17 via the WhatsApp phone application and directed SOI #17 to meet HERNANDEZ BACA in Pleasant Prairie, Wisconsin. SOI #17 complied with HERNANDEZ BACA's directive. SOI #17 stated that HERNANDEZ BACA was operating a white Toyota Camry.[7]

72.    SOI #17 stated that SOI #17 then followed HERNANDEZ BACA to an exit near the Indiana State Line just outside of the Chicago, Illinois, area. SOI #17 followed HERNANDEZ BACA into an alley where HERNANDEZ BACA met with a Hispanic male who was operating a black truck. HERNANDEZ BACA then introduced SOI #17 to the driver of the truck. SOI #17 provided cash to the driver of the truck, who then told SOI #17 to retrieve a black garbage back from the back of the truck. SOI #17 retrieved the black garbage bag, which contained six bundles of cocaine, with each bundle being a half kilogram quantity of cocaine.

---

[7] Case agents observed that in the photos section of SOI #17's cellular telephone bearing number cellular number 213-605-4333, case agents located a photograph of HERNANDEZ BACA driving what appears to be a white Toyota Camry or Avalon, both of which are similar vehicles.

28

73. SOI #17 placed the six bundles of cocaine into SOI #17's associate's vehicle and the associate drove towards Milwaukee with the cocaine. SOI #17 then met with HERNANDEZ BACA in HERNANDEZ BACA's white Camry. Because the transaction occurred for less than the five kilograms of cocaine that was initially contemplated, SOI #17 did not provide the full $200,000 to the driver. After SOI #17 entered HERNANDEZ BACA's vehicle, HERNANDEZ BACA removed $10,000 in U.S. currency from SOI #17's backpack, which contained the remaining U.S. currency that SOI #17 brought to purchase the cocaine. HERNANDEZ BACA indicated that HERNANDEZ BACA needed the cash for the restaurant. SOI #17 and HERNANDEZ BACA then drove back to Milwaukee. Once in Milwaukee, SOI #17 and HERNANDEZ BACA drove to SOI #17's "stash house" where the cocaine was located. SOI #17's associate had been driven the cocaine to the "stash house" for SOI #17.

74. SOI #17 stated that SOI #17 had invested $200,000 of SOI #17's drug proceeds into the Carnitas Los Gallos restaurant, located at 2531 W. National Avenue in Milwaukee, Wisconsin. SOI #17 gave large amounts of cash to HERNANDEZ BACA and HERNANDEZ BACA used the cash to obtain checks to use to purchase the restaurant. HERNANDEZ BACA did not disclose the names that HERNANDEZ BACA used on the checks to SOI #17. SOI #17 stated that SOI #17 was the major financial investor in the Carnitas Los Gallos restaurant. Although it was HERNANDEZ BACA's idea to open the restaurant, SOI #17 did not believe that HERNANDEZ BACA used any of HERNANDEZ BACA's money to open the

29

restaurant. SOI #17 stated that HERNANDEZ BACA wanted to use SOI #17's money to open the restaurant in order to launder SOI #17's drug proceeds.

**2.      Information Obtained from Cooperating Source Eighteen (SOI #18)[8]**

75.      In June of 2022, case agents met with SOI #18. SOI #18 provided the following information related to HERNANDEZ BACA.

76.      SOI #18 stated that PEREZ III began obtaining cocaine from "Gallo" in 2020. SOI #18 was shown a photograph of Francisco HERNANDEZ BACA, and SOI #18 identified HERNANDEZ BACA as the individual SOI #18 knows as "Gallo."

77.      SOI #18 stated that all the cocaine transactions between PEREZ III and HERNANDEZ BACA occurred in the Chicago, Illinois area. HERNANDEZ BACA arranged the cocaine transactions for PEREZ III through people that HERNANDEZ BACA knew. SOI #18 never personally traveled to the Chicago area with PEREZ III and/or HERNANDEZ BACA, but SOI #18 was aware of the transactions.

78.      SOI #18 was aware of two separate cocaine transactions that occurred between PEREZ III and HERNANDEZ BACA. SOI #18 recalled that both

---

[8]  Beginning in June of 2022, SOI #18 made statements against SOI # 18's penal interest. According to law enforcement databases, SOI #18 has a prior felony conviction for a drug trafficking conspiracy. SOI #18 is cooperating in exchange for consideration in the previously mentioned felony conviction. Thus far, the information provided by SOI #18 has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the investigation. More specifically, SOI 18's information has been corroborated by seizures of physical evidence, documentary evidence, and lawfully obtained device extractions, physical surveillance, and examination of other police reports. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe SOI #18 is credible and SOI #18's information reliable.

transactions occurred "a couple of months" before SOI #18 was arrested in September of 2020.

79.     SOI #18 stated that HERNANDEZ BACA arranged to sell two kilograms of cocaine to PEREZ III for approximately $32,000 per kilogram on the first transaction, and the second transaction was arranged for three kilograms of cocaine.

80.     On the first transaction, SOI #18 assisted PEREZ III with counting out the money needed for the kilograms of cocaine. SOI #18 witnessed HERNANDEZ BACA pick up PEREZ III in the Milwaukee area. Later, SOI #18 witnessed HERNANDEZ BACA drop off PEREZ III in the Milwaukee area.

81.     After PEREZ III was dropped off by HERNANDEZ BACA, PEREZ III drove SOI #18 to a stash house in Milwaukee that PEREZ III utilized at the time. At the stash house, PEREZ III displayed two kilograms of cocaine to SOI #18. HERNANDEZ BACA was not present at the stash house when PEREZ III displayed the kilograms of cocaine to SOI #18.  Nevertheless, PEREZ III told SOI #18 that HERNANDEZ BACA had arranged for PEREZ III to purchase the kilograms of cocaine.

82.     Approximately one week later, PEREZ III told SOI #18 that PEREZ III needed more cocaine and that HERNANDEZ BACA had agreed to obtain the cocaine for PEREZ III. PEREZ III told SOI #18 that HERNANDEZ BACA couldn't accompany PEREZ III to facilitate the cocaine transaction.  Consequently, PEREZ III needed one of PEREZ III's associates to accompany PEREZ III to the Chicago area to purchase the cocaine.

31

83. SOI #18 stated that PEREZ III left for Chicago. PEREZ III later told SOI #18 that PEREZ III traveled to the same Chicagoland area where PEREZ III had previously obtained three kilograms of cocaine which had been arranged by HERNANDEZ BACA.

84. Upon returning to Milwaukee, PEREZ III told SOI #18 that PEREZ III had taken the cocaine to PEREZ III's stash house in Milwaukee. PEREZ III's associate dropped off PEREZ III at SOI #18's residence, and HERNANDEZ BACA followed the associate in a different vehicle. PEREZ III and SOI #18 then went to the stash house where SOI #18 observed three kilograms of cocaine on a table. PEREZ III and PEREZ III's associate were talking about the transaction in front of SOI #18. PEREZ III and PEREZ III's associate were talking about how "crazy" the three-kilogram cocaine transaction had been, and how "smooth" the drive back to Milwaukee had been when the associate was driving with the cocaine. After leaving the stash house, PEREZ III and SOI #18 then met HERNANDEZ BACA at HERNANDEZ BACA's restaurant on South 13th Street to eat.

85. SOI #18 was aware that PEREZ III and HERNANDEZ BACA had started a restaurant business together called "Carnitas Los Gallos." SOI #18 stated that HERNANDEZ BACA and PEREZ III had started the restaurant together in order to "legitimize" PEREZ III's drug proceeds. SOI #18 believed that most of the initial financial investment came from PEREZ III to start up the restaurant. SOI #18 had overheard HERNANDEZ BACA say that HERNANDEZ BACA didn't have money to invest. SOI #18 believed that HERNANDEZ BACA and PEREZ III were

going to be "50/50 partners" in the restaurant, and that HERNANDEZ BACA was going to pay back PEREZ III for HERNANDEZ BACA's portion of the initial investment. SOI #18 knew that PEREZ III had invested "a large amount of money" into the restaurant, but SOI #18 was unaware of the exact amount. SOI #18 stated that SOI #18 was often not present when PEREZ III and HERNANDEZ BACA were discussing the specifics of the financial arrangements. However, SOI #18 was aware that HERNANDEZ BACA needed PEREZ III's money to start the restaurant, and that HERNANDEZ BACA was going to supply the cooks and set up the menu.

86. SOI #18 knew that HERNANDEZ BACA had given a gold necklace and "rooster" pendant to PEREZ III. Case agents are aware that this gold necklace and "rooster" pendant were forfeited to the government in the above-referenced case.

### 3. Information Obtained from Cooperating Source Three (SOI #3)[9]

87. In late 2020, and again in September of 2021, case agents met with SOI #3. SOI #3 provided the following information related to HERNANDEZ BACA.

88. SOI #3 identified a photograph of Francisco HERNANDEZ BACA as the individual that SOI #3 knows by the street name of "Gallo."

---

[9] Beginning in November of 2020, SOI #3 made statements against SOI #3's penal interest. According to law enforcement data bases, SOI #3 has municipal convictions and prior felony convictions for a drug trafficking conspiracy and the use of firearms in furtherance of drug trafficking. SOI #3 is cooperating in exchange for consideration in the two previously mentioned felony convictions. Thus far, the information provided by SOI #3 has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the investigation. More specifically, SOI #3's information has been corroborated by seizures of physical evidence, documentary evidence and lawfully obtained device extractions, physical surveillance, and examination of police reports. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe SOI #3 is credible and SOI #3's information reliable.

33

89.     SOI #3 stated in mid-September of 2020, PEREZ III told SOI #3 to get ready to take a "trip," which SOI #3 knew was in reference to driving cocaine for PEREZ III. Shortly after the conversation, PEREZ III contacted SOI #3 and made arrangements to meet SOI #3 in the Milwaukee, Wisconsin area. At the time, PEREZ III was operating a white minivan and Esteban Reyes was the passenger. Under the direction of PEREZ III, SOI #3 followed PEREZ III and Esteban Reyes towards the Chicago, Illinois area.

90.     While en route to Chicago, PEREZ III and Reyes stopped at a truck stop near Pleasant Prairie, Wisconsin, where PEREZ III met with "Gallo" (HERNANDEZ BACA). SOI #3 recalled that HERNANDEZ BACA was driving a newer white sedan. SOI #3 followed HERNANDEZ BACA, and PEREZ III and Reyes followed SOI #3 towards the Chicagoland area.

91.     SOI #3 recalled stopping somewhere near Gary, Indiana, just outside of Chicago, where SOI #3 followed HERNANDEZ BACA into an alley. Once in the alley, SOI #3 observed a truck parked next to a garage. Because the truck was not visible to SOI #3, SOI #3 was unable to recall any of the truck's details. PEREZ III exited PEREZ III's vehicle and PEREZ III entered HERNANDEZ BACA's vehicle. SOI #3 was aware that PEREZ III had brought a large amount of U.S. currency with him. PEREZ III and HERNANDEZ BACA drove in the direction of the truck which was parked in the alley.  PEREZ III and HERNANDEZ BACA then parked next to the truck. SOI #3 "hung back" in the alley and was unable to see with whom PEREZ III and HERNANDEZ BACA met.

34

92.     A short time later, SOI #3 observed PEREZ III carrying a blanket. PEREZ III approached SOI #3's vehicle, and SOI #3 observed that there were three kilograms of cocaine wrapped in the blanket that PEREZ III was carrying. PEREZ III placed the blanket containing the three kilograms of cocaine into the trunk of SOI #3's vehicle. PEREZ III told SOI #3 that PEREZ III would meet SOI #3 back in Milwaukee. SOI #3 then began driving and while driving out of the alley, SOI #3 observed HERNANDEZ BACA re-enter HERNANDEZ BACA's vehicle, and they left the area.

93.     SOI #3 drove the three kilograms of cocaine to the stash house in Milwaukee that PEREZ III was utilizing at the time. PEREZ III later arrived at the stash house and SOI #3 observed PEREZ III unwrap the three kilograms of cocaine. SOI #3 obtained a portion of one of the kilograms of cocaine for SOI #3 to sell.

94.     SOI #3 knew that PEREZ III and HERNANDEZ BACA were "business partners" and that HERNANDEZ BACA assisted PEREZ III with the laundering of drug proceeds. SOI #3 did not talk to PEREZ III very much about HERNANDEZ BACA's involvement in cocaine.  Further, SOI #3 did not know if HERNANDEZ BACA was previously involved in selling cocaine with PEREZ III prior to this incident.

95.     SOI #3 stated that after PEREZ III was arrested, PEREZ III suspected that HERNANDEZ BACA was "snitching" and that was why PEREZ III and other members of the PEREZ III DTO were arrested on September 22, 2020.

**4. Information Obtained from Cooperating Source Seven (SOI #7)[10]**

96.    In mid-summer and again in late fall of 2021, case agents met with SOI #7. SOI #7 provided the following information related to HERNANDEZ BACA.

97.    SOI #7 stated that PEREZ III began selling kilogram quantities of cocaine around the age of 16. SOI #7 was aware that numerous individuals supplied PEREZ III with cocaine. In 2018, SOI #7 sold cocaine obtained from PEREZ III before SOI #7 was incarcerated.

98.    During the summer of 2020, SOI #7 stated that due to the COVID 19 pandemic a shortage of cocaine existed.

99.    SOI #7 was shown a photograph of Francisco HERNANDEZ BACA, and SOI #7 identified HERNANDEZ BACA as the individual that SOI #7 knows by the street name of "Gallo."

100.    SOI #7 stated that HERNANDEZ BACA owned a restaurant in the area of South 13th Street and West Maple Street in Milwaukee.  SOI #7 was also aware that PEREZ III and HERNANDEZ BACA were "business partners" in a restaurant

---

[10]  Beginning in June of 2021, SOI #7 made statements against SOI #7's penal interest.  According to law enforcement data bases, SOI #7 has prior felony convictions for a drug trafficking conspiracy and the use of firearms in furtherance of drug trafficking. SOI #7 is cooperating in exchange for consideration in the previously mentioned felony convictions. Additionally, SOI #7 has prior felony convictions for Armed Robbery, Possession of Cocaine, Second Offense, and a misdemeanor conviction for Possession of Marijuana. Thus far, the information provided by SOI #7 has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the investigation.  More specifically, SOI #7's information has been corroborated by seizures of physical evidence, documentary evidence, and lawfully obtained device extractions, physical surveillance, and examination of other police reports. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe SOI #7 is credible and SOI #7's information reliable.

36

that HERNANDEZ BACA owned with PEREZ III in the area of South 25th Street and West National Avenue.

101.    SOI #7 learned about HERNANDEZ BACA's involvement in cocaine around the spring of 2020. SOI #7 was driving around Milwaukee in a vehicle with PEREZ III and Antonio Rodriguez. PEREZ III and Rodriguez were discussing the cocaine shortage that occurred as a result of the pandemic. During this conversation, the two further discussed who might have cocaine available for sale. Rodriguez told PEREZ III that they should "check with Gallo." PEREZ III told Rodriguez to contact "Gallo" (HERNANDEZ BACA) and see if "Gallo" could obtain cocaine for them.

102.    SOI #7 then went to HERNANDEZ BACA's restaurant on South 13th Street and West Maple Street with PEREZ III and Rodriguez. Rodriguez met with HERNANDEZ BACA, and Rodriguez and HERNANDEZ BACA went to the back of the restaurant to talk. Upon returning to the table where SOI #7 and PEREZ III were sitting, Rodriguez told PEREZ III that "nothing was going on," which SOI #7 understood to mean that at the time cocaine was unavailable.

103.    Sometime around late summer of 2020, PEREZ III told SOI #7 that HERNANDEZ BACA was "a plug," which SOI #7 understood to mean that HERNANDEZ BACA supplied cocaine to PEREZ III.

104.    Around the same time PEREZ III told SOI #7 that HERNANDEZ BACA was "a plug," SOI #7, PEREZ III and HERNANDEZ BACA were driving around Milwaukee in HERNANDEZ BACA's truck. PEREZ III and HERNANDEZ BACA discussed purchasing various properties and discussed purchasing a restaurant

37

together. During the conversation, PEREZ III also mentioned purchasing kilograms of cocaine from HERNANDEZ BACA. HERNANDEZ BACA told PEREZ III to give HERNANDEZ BACA "some time" because HERNANDEZ BACA needed to "look into it" for PEREZ III. PEREZ III told HERNANDEZ BACA that PEREZ III was "ready to work." In response, HERNANDEZ BACA told PEREZ III that HERNANDEZ BACA was "here for you guys" and, if possible, HERNANDEZ BACK would help PEREZ III. PEREZ III told HERNANDEZ BACA that SOI #7 was "a major player" and would help PEREZ III sell the cocaine.

105.   HERNANDEZ BACA told PEREZ III that HERNANDEZ BACA would contact "his people" in Chicago. PEREZ III told HERNANDEZ BACA that PEREZ III was looking to purchase five kilograms of cocaine to start, but no prices were discussed. HERNANDEZ BACA told PEREZ III that HERNANDEZ BACA "moved bricks;" however, HERNANDEZ BACA was "chilling out" during the time that this conversation occurred.

106.   Shortly after this conversation took place, PEREZ III told SOI #7 that PEREZ III was going to obtain kilogram quantities of cocaine soon, and that HERNANDEZ BACA was going to supply the cocaine to PEREZ III. Because SOI #7 was then arrested, SOI #7 was unaware whether this transaction ever occurred.

107.   In early August of 2020, PEREZ III told SOI #7 that HERNANDEZ BACA and PEREZ III were going to be partners in a restaurant. SOI #7 did not know how much money PEREZ III and/or HERNANDEZ BACA invested in the restaurant but knew that PEREZ III had purchased the building where the restaurant was going

38

to be located. SOI #7 stated that PEREZ III was going launder drug proceeds through the restaurant.

108. SOI #7 stated that HERNANDEZ BACA had given PEREZ III a "rooster pendant." Case agents know that the "rooster pendant" referred to by SOI #7 is the same pendant that was seized from HERNANDEZ BACA's wife on September 25, 2020. SOI #7 stated that the "rooster" symbolized "being together" as well as being a trusted friend. SOI #7 further stated that the rooster is used as a symbol of loyalty and "being solid" for the cartel in Mexico.[11]

### 5. Recorded meeting between Cooperating Source Nineteen (SOI #19)[12] and HERNANDEZ BACA on June 8, 2022

109. On June 8, 2022, under the direction of case agents, SOI #19 met with Francisco HERNANDEZ BACA at HERNANDEZ BACA's restaurant, Taqueria Los Gallos, 1800 S. 13th Street, Milwaukee, Wisconsin. SOI #19 made arrangements to meet with HERNANDEZ BACA by contacting HERNANDEZ BACA at (414) 629-

---

[11] The English translation of the Spanish word "gallo" is rooster.

[12] SOI #19 is assisting case agents while working under a deferred action approved by Immigration and Customs Enforcement. Additionally, SOI #19 has received monetary compensation since 2015 for SOI #19's work as a Confidential Source (CS), as well as reimbursement for expenses. Further, SOI #19 expects to be compensated in connection with this investigation. SOI #19 has provided accurate and reliable information to case agents since 2015. Case agents believe the information provided by SOI #19 to be truthful and reliable for several reasons: (1) SOI #19 has provided detailed and corroborated information regarding numerous individuals involved in drug trafficking and drug trafficking activities, which case agents have been able to verify through independent investigation; (2) SOI #19, while acting under the control of law enforcement, has been directly involved in controlled money laundering transactions with known money laundering targets; and (3) SOI #19 has given law enforcement officers information which directly led to the seizure of controlled substances and other contraband, and to the arrests and filing of criminal charges against numerous individuals. During this investigation, SOI #19 received a traffic citation in Wisconsin for operating a vehicle while intoxicated. SOI #19 has no criminal record.

4401 **(Target Cell Phone #1).** This meeting was recorded by case agents and the following paragraphs summarize the recorded conversation between SOI #19 and HERNANDEZ BACA that occurred on June 8, 2022. During this meeting, the conversation occurred in Spanish. Consequently, case agents have relied on the summary of the conversation provided to case agents through trained linguists at the Federal Bureau of Investigation (FBI).

110.   During this meeting, SOI #19 stated that SOI #19 was bringing kilogram quantities of cocaine from California to Minnesota for distribution. SOI #19 stated that the individual to whom SOI #19 was going to sell the cocaine in Minnesota had already received cocaine from another supplier. HERNANDEZ BACA told SOI #19 that nobody had "volume" around here, which case agents believe was in reference to large amounts of cocaine in the Milwaukee area. SOI #19 asked HERNANDEZ BACA if anyone else needed that many kilograms of cocaine to which HERNANDEZ BACA replied, "Chicago." SOI #19 agreed with HERNANDEZ BACA, and told HERNANDEZ BACA that there weren't many, twenty, referring to the number of kilograms of cocaine that SOI #19 had for sale.

111.   HERNANDEZ BACA then explained to SOI #19 that the person with whom HERNANDEZ BACA "was with was busted." Based upon their familiarity with the investigation, case agents believe HERNANDEZ BACA told SOI #19 that HERNANDEZ BACA's associate who could move kilogram quantities of cocaine was arrested. SOI #19 asked HERNANDEZ BACA if the individual was "busted" in Milwaukee, and HERNANDEZ BACA replied affirmatively. HERNANDEZ BACA

stated that HERNANDEZ BACA and the individual had worked hard and that it was "five or six." Based upon their training, experience and familiarity with the investigation, case agents believe that the "busted" individual to whom HERNANDEZ BACA referred is PEREZ III, and that HERNANDEZ BACA's statement of "five or six" is in reference to the number of kilograms that HERNANDEZ BACA had arranged for PEREZ III to purchase.

112. SOI #19 then told HERNANDEZ BACA that SOI #19 sometimes leaves drug proceeds with other individuals that SOI #19 knows because SOI #19 didn't like transporting money back and forth.

113. HERNANDEZ BACA told SOI #19 that HERNANDEZ BACA didn't understand, and SOI #19 told HERNANDEZ BACA that SOI #19 would put the money in the "washing machine," referring to laundering SOI #19's drug proceeds. HERNANDEZ BACA asked SOI #19 how the system of laundering drug proceeds worked, and SOI #19 stated that, for example, SOI #19 would leave $100,000 or $200,000 with HERNANDEZ BACA.

114. SOI #19 and HERNANDEZ BACA continued to discuss laundering drug proceeds. SOI #19 told HERNANDEZ BACA that instead of taking the drug proceeds with SOI #19, SOI #19 "leaves it" (i.e., leaving the drug proceeds in Milwaukee). HERNANDEZ BACA asked SOI #19 how much HERNANDEZ BACA would receive for laundering SOI #19's drug proceeds. SOI #19 replied that HERNANDEZ BACA would receive ten percent. SOI #19 further related to HERNANDEZ BACA that HERNANDEZ BACA would receive $10,000 for every $100,000 that HERNANDEZ

BACA laundered for SOI #19. HERNANDEZ BACA thanked SOI #19 for trusting HERNANDEZ BACA.

115. HERNANDEZ BACA then asked SOI #19 what was "the number" (i.e., the price per kilogram of cocaine). SOI #19 replied to HERNANDEZ BACA that the price of each kilogram would be around $28,000. HERNANDEZ BACA stated that HERNANDEZ BACA would ask his people in Chicago and get back to SOI #19.

### III.   CONCLUSION

116. Case agents searched law enforcement databases to confirm that **Target Cell Phone #1** is currently being serviced by T-Mobile.

117. Case agents are requesting this warrant authorizing the disclosure of data related to **Target Cell Phone #1** for **30** days to further investigate HERNANDEZ BACA's activities, to identify locations to which HERNANDEZ BACA is traveling to further his drug distribution network, and to further identify the nature, scope, and structure of this DTO.

118. Based upon my training and experience, I know that individuals involved in drug trafficking use their cellular telephones to contact other drug dealers and drug purchasers, and that information relating to their telephones may show the areas in which they are trafficking drugs and the individuals who they are contacting to sell or distribute the drugs. Based upon the facts in this affidavit, there is probable cause to believe that HERNANDEZ BACA is engaged in the trafficking and distribution of Cocaine and is using **Target Cell Phone #1** while engaged in these crimes.  I further submit that probable cause exists to believe that

obtaining the location information of **Target Cell Phone #1** will assist case agents in determining HERNANDEZ BACA's customers, co-conspirators, sources of supply, and help to identify stash houses.

119.    In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

### Cell-Site Data

120.    Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell

43

tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

121.    Based on my training and experience, I know that T-Mobile also can collect per-call measurement data, which T-Mobile also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

### E-911 Phase II / GPS Location Data

122.    I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases,

44

the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available.

<u>Subscriber Information</u>

123.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the

45

information can be used to identify the Target Cell Phone's user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

124. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

125. I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

126. I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

127. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until **180 days** after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate

46

notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

128. Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## ATTACHMENT A

### Property to Be Searched

Records and information associated with the cellular device assigned call number **(414) 629-4401** (referred to herein and in Attachment B as "**Target Cell Phone #1**"), with listed subscriber of Geno Nottolinis Pizza, LLC, 1101 S. 26th Street, Milwaukee, Wisconsin, that is in the custody or control of T-Mobile, (referred to herein and in Attachment B as the "Provider"), a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey 07054.

1.  **Target Cell Phone #1.**

# ATTACHMENT B

## Particular Things to be Seized

## I.  Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.  The following subscriber and historical information about the customers or subscribers associated with **Target Cell Phone #1** for the time period January 1, to the present:

   i.  Names (including subscriber names, user names, and screen names);

   ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii.  Local and long-distance telephone connection records;

   iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v.  Length of service (including start date) and types of service utilized;

vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix.  All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by **Target Cell Phone #1** for the time period January 1, 2020, to the present including:

  a.  the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone

3

numbers (call detail records), email addresses, and IP addresses); and

    b.   information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as per-call measurement data (also known as "real-time tool" or "RTT").

b.   Information associated with each communication to and from **Target Cell Phone #1** for a period of **30** days from the date of this warrant, including:

    i.   Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

    ii.   Source and destination telephone numbers;

    iii.   Date, time, and duration of communication; and

    iv.   All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e., faces of the towers) to which **Target Cell Phone #1** will connect at the beginning and end of each communication, as well as per-call measurement data (also known as "real-time tool" or "RTT").

c.   Information about the location of **Target Cell Phone #1** for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II

4

data, RTT data, GPS data, latitude-longitude data, and other precise location information.

    i.    To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of Target Cell Phone #1 on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

    ii.    This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.    Information to be Seized by the Government

5

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846; and Title 18, United States Code, Sections 1956 and 1957, involving Francisco HERNANDEZ BACA.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC

# RECORDS PURSUANT TO FEDERAL RULES OF

# EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by T-Mobile, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of T-Mobile. The attached records consist of _____.

I further state that:

a.	All records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of T-Mobile and they were made by T-Mobile as a regular practice; and

b.	Such records were generated by T-Mobile's electronic process or system that produces an accurate result, to wit:

1.	The records were copied from electronic device(s), storage medium(s), or file(s) in the custody of T-Mobile in a manner to ensure that they are true duplicates of the original records; and

2.      The process or system is regularly verified by T-Mobile and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____        _____
Date                             Signature